UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ANNETTE MANCERA, As Next Friend for VERONICA RODRIGUEZ, a Minor, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. |
| JO ANNE B. BARNHART, Commissioner of the Social Security Administration, | § § § § § | SA-05-CA-1242 RF (NN) |
| Defendant. | § § | |

MEMORANDUM AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

**TO:** Hon. Royal Furgeson
United States District Judge

### I. Introduction

Plaintiff Annette Mancera seeks review and reversal of the administrative denial of her application for Supplemental Security Income (SSI) benefits for her minor daughter, Veronica Rodriguez. Mancera contends that the Social Security Administration (SSA) Appeals Council erred by not remanding her application to the Administrative Law Judge (ALJ). Mancera asks the Court to reverse the decision of the ALJ concluding that Veronica is not disabled, and to render a judgment awarding Veronica benefits. In the alternative, Mancera asks the Court to remand the case for further factual development based on the new evidence she submitted to the Appeals Council.

After considering Mancera's brief in support of her complaint,[1] the brief in support of the

---

[1] Docket entry # 13.

SSA's decision denying benefits,[2] Mancera's reply brief,[3] the record of the SSA proceedings, the pleadings on file, the applicable case authority and relevant statutory and regulatory provisions, and the entire record in this case, I recommend affirming the decision.

I have jurisdiction to enter this Memorandum and Recommendation under 28 U.S.C. § 636(b) and this district's general order, dated July 17, 1981, referring all cases where a plaintiff seeks review of the Commissioner's denial of the plaintiff applications for benefits for disposition by recommendation.[4]

## II. Jurisdiction

The District Court has jurisdiction to review the Commissioner's final decision as provided by 42 U.S.C. §§ 405(g), 1383(c)(3).

## III. Administrative Proceedings

Mancera fully exhausted her administrative remedies prior to filing this action in federal court. Mancera filed her application on Veronica's behalf on January 8, 2004, alleging disability beginning on January 1, 2003.[5] At that time, Veronica was 12 years old. Mancera indicated in her application that Veronica had problems with depression.[6] The Commissioner denied the

---

[2] Docket entry # 14.

[3] Docket entry # 15.

[4] *See* Local Rules for the Western District of Texas, appx. C, p. 10.

[5] SSA record, p. 100.

[6] *Id.* at p. 106.

application initially and on reconsideration.[7]  Mancera then asked for a hearing.[8]  A hearing was held before the ALJ on July 13, 2005.[9]  At the time of the hearing, Veronica was 13 years old and had completed the seventh grade.[10]  The ALJ issued a decision on August 28, 2005, concluding that Veronica is not disabled and thus ineligible to receive SSI benefits.[11]  On September 15, 2005, Mancera asked for review of the decision.[12]  On October 21, 2005, Mancera submitted additional evidence to the Appeals Council.[13]  The Appeals Council concluded on November 17, 2005 that no reason existed to review the ALJ's decision.[14]  The decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).  Mancera filed this action seeking review of the Commissioner's decision on January 4, 2006.[15]

### IV. Issue Presented

>Is the ALJ's decision that Veronica was not under a "disability," as defined by the Social Security Act (the Act), at any time through the date of the decision, supported by substantial evidence and does the decision comport with relevant legal standards?

---

[7]*Id*. at pp. 72 & 79.

[8]*Id*. at p. 83.

[9]*Id*. at p. 318-43.

[10]*Id*. at 320-21.

[11]*Id*. at pp. 60-68.

[12]*Id*. at p. 59.

[13]*Id*. at p. 8.

[14]*Id*. at p. 5.

[15]*See* docket entry # 3.

## V. Analysis

### A. Standard of Review

In reviewing the Commissioner's decision denying disability benefits, the reviewing court is limited to determining whether substantial evidence supports the decision and whether the Commissioner applied the proper legal standards in evaluating the evidence.[16]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[17]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[18]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[19]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner.[20]  Where a claimant submits new evidence to the Appeals Council and the Appeals Council denies the claimant's request for review of the ALJ's

---

[16] *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995); 42 U.S.C. §§ 405(g), 1383(c)(3).

[17] *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[18] *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988) (quoting *Hames*, 707 F.2d at 164).

[19] *Martinez*, 64 F.3d at 173.

[20] *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see also Villa*, 895 F.2d at 1021 (The court is not to reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.).

decision, the evidence submitted for the first time to the Appeals Council becomes part of the record to be reviewed by the reviewing court.[21] Conflicts in the evidence and credibility assessments are for the Commissioner and not for the courts to resolve.[22] Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[23]

**1. Entitlement to Benefits**

Every child under the age of 18 who meets certain income and resource requirements, has filed an application for benefits, and is under a disability, is eligible to receive SSI benefits.[24] A child under the age of 18 is considered "disabled" if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,"[25] and the child does not engage in substantial

---

[21]*See Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005) (explaining that the district court must consider evidence submitted for the first time to the Appeals Council because the Appeals Council considered and evaluated the evidence, and thus the evidence constitutes evidence upon which the decision complained about is based).

[22]*Martinez*, 64 F.3d at 174.

[23]*Id.*

[24]*See* 42 U.S.C. § 1382(a)(1) & (2). *See also* 42 U.S.C. § 1382(e)(1)(B) & (G).

[25]42 U.S.C. § 1382c(a)(3)C)(i).

gainful activity.[26]

### 2. Evaluation Process

Regulations set forth by the Commissioner prescribe that disability claims involving a child are to be evaluated according to a three-step process.[27] A finding that the child is disabled or not disabled at any point in the process is conclusive and terminates the Commissioner's analysis.[28]

The first step in the process involves determining whether the child is currently engaged in substantial gainful activity.[29] If the child is engaged in substantial gainful activity, the child will be deemed not disabled and the child's claim will not be evaluated further.[30] The second step involves determining whether the child has a physical or mental impairment, or a combination of impairments, that is severe.[31] If the child does not have a severe impairment, the child will not be considered disabled and the claim will not be evaluated further.[32] Where the child has a severe impairment, the third step involves determining whether the child's impairment(s) meets, medically equals, or functionally equals a listed impairment in 20 C.F.R.,

---

[26]*See* 42 U.S.C. § 1382c(a)(3)(C)(ii).

[27]*See* 20 C.F.R. § 416.924(a).

[28]*See id*.

[29]*See id*.

[30]*See id*.

[31]*See id*.

[32]*See id*.

Part 404, Subpart P, Appendix 1 (Appendix 1).[33]  If the child does not have a listed impairment, the child will be deemed not disabled.[34]  If the child has such an impairment, the child will be deemed disabled.[35]

## B. Findings and Conclusions of the ALJ

In the instant case, the ALJ reached his decision at step three of the process.  At step one, the ALJ determined that Veronica had not engaged in substantial gainful activity during any part of the period of adjudication.[36]  At step two, the ALJ determined that Veronica has dysthmymic disorder and generalized anxiety disorder.[37]  The ALJ characterized these impairments as severe.[38]  In step three, the ALJ determined that the evidence failed to establish that Veronica's impairments meet or medically equal a listed impairment.[39]  The ALJ then determined that Veronica's impairments do not functionally equal a listed impairment because Veronica does not have marked limitations in two of the six domains of functioning used to assess functional equivalence, or an extreme limitation in one domain.[40]  Thus, the ALJ concluded that Veronica is

---

[33]*See id*.  *See also* 20 C.F.R. pt. 404, subpt. P., app. 1.

[34]*See* 20 C.F.R. § 416.924(a).

[35]*See id*.

[36]SSA record, p. 64.

[37]*Id*.

[38]*Id*.

[39]*Id*.

[40]*Id*. at pp. 67-68.

not disabled for the purpose of the Act.[41]

**C.  Mancera's Allegation of Error**

After seeking review of the ALJ's decision, Mancera submitted additional evidence to the Appeals Council—*i.e.*, school records showing that Veronica had been sent to alternative school. On review, Mancera argues that the Appeals Council erred in failing to remand based on this evidence.  Mancera maintains that the new evidence constitutes evidence of a marked limitation in the domain of caring for yourself and requires the ALJ to reconsider the testimony of the medical expert who testified at Veronica's hearing.  Mancera contends a reasonable probability exists that the new evidence would change the outcome in her case.  Because Mancera's argument challenges the second part of the ALJ's step-three analysis—whether Veronica's impairments functionally equal a listed impairment—my analysis of the evidence focuses on that step.

Where a child has an impairment that does not meet or medically equal a listed impairment, the ALJ must determine whether the impairment "results in limitations that functionally equal the listings."[42]  To determine whether a child has an impairment that is functionally equal to a listed impairment, the SSA assesses a child's activities in six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for self, and (6) health and physical well-being.[43]  For an impairment to qualify as functionally equal to a listed impairment,

---

[41]*Id.*

[42]20 C.F.R. § 416.926a(a).

[43]*See* 20 C.F.R. § 416.926a(b)(1).

the child's impairment must result in marked limitations in two domains of functioning or an extreme limitation in one domain.[44] A limitation is "marked" when the "impairment(s) interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities."[45]

The first evidence of Veronica's ability to function in the six domains is a disability evaluation form, dated June 2, 2004, completed by Dr. J.D. Marler, a licensed psychologist.[46] Dr. Marler made the following assessments: (1) less than marked limitation in the domain of acquiring and using information,[47] (2) no limitation in the domain of attending and completing tasks,[48] (3) less than marked limitation in the domain of interacting and relating with others,[49] (4) no limitation in the domain of moving about and manipulating objects,[50] (5) no limitation in the domain of caring for self,[51] and (6) no limitation in the domain of health and physical well-being.[52] This evidence supports the ALJ's determination because Dr. Marler did not find that Veronica's impairments result in marked limitations in two domains of functioning or an

---

[44]*See* 20 C.F.R. § 416.926a(a).

[45]20 C.F.R. § 416.926a(e)(ii)(2).

[46]*Id*. at pp. 179-84.

[47]*Id*. at p. 181.

[48]*Id*.

[49]*Id*.

[50]*Id*. at p. 182.

[51]*Id*.

[52]*Id*.

extreme limitation in one domain.[53]

The other and most recent evidence about Veronica's limitations in the six domains of functioning is the testimony of Dr. Melvin L. Cohen, the medical expert who testified at Veronica's hearing.[54] Dr. Cohen first indicated that he had reviewed Veronica's medical and school records.[55] The ALJ then questioned Dr. Cohen about the impairments and functional limitations reflected in Veronica's records. About Veronica's limitations in the six domains of functioning, Dr. Cohen testified that Veronica had the following limitations: (1) less than marked limitation in the domain of acquiring and using information,[56] (2) less than marked limitation in the domain of attending and completing tasks,[57] (3) marked limitation in the domain of interacting and relating with others,[58] (4) no limitation in the domain of moving about and manipulating objects,[59] (5) less than marked limitation in the domain of caring for self,[60] and (6) less than marked limitation in the domain of health and physical well-being.[61]

About the domain of caring for self—relevant to Mancera's argument—Dr. Cohen stated

---

[53] *See* 20 C.F.R. § 416.926a(a).

[54] *See* SSA record, pp. 334-41.

[55] *See id.* at p. 334.

[56] *Id.* at p. 335.

[57] *Id.* at p. 336.

[58] *Id.*

[59] *Id.*

[60] *Id.* at p. 336-37.

[61] *Id.* at p. 337.

10

that "[t]he only thing she has in that area [sic] she does harm herself."[62] Dr. Cohen explained that "[w]e've heard testimony of a couple of times she's carved on herself so I'll say there is some limitation at less than a marked level."[63] Dr. Cohen was referring to Veronica's responses to the ALJ's questions, and Mancera's testimony, about an incident in which Veronica carved her initials in her right arm with a sewing needle. Veronica testified that she used a sewing needle to carve her name in her arm because she was depressed because her "brother was saying stuff to me that I didn't like."[64] She indicated that she had only carved her arm once.[65] Mancera, however, tried to suggest that Veronica had carved on herself more than once. When the ALJ's questioned Mancera about the carving incident, Mancera responded, "[s]he's done more than that."[66] But rather than testify about another carving incident, Mancera complained about Child Protective Services's involvement with the family and disciplinary problems she had with Veronica.[67] Mancera did not testify about a specific incident in which Veronica had carved on herself.[68] The record supports at least one incident. That incident is reflected in Veronica's medical records from Nix Speciality Hospital.

On February 24, 2005, Veronica was admitted to the Nix Speciality Hospital for

---

[62]*Id*. at p. 336.

[63]*Id*. at p. 336-37.

[64]*Id*. at p. 328.

[65]*Id*.

[66]*Id*. at p. 330.

[67]*Id*.

[68]*See id*. at p. 333 (Mancera stating that the self-mutilation happened at school) & p. 342 (Mancera complaining that Veronica's school would not transfer Veronica to alternative school).

increased problems with depression.[69] The records for that admission include a medical consultation form, dated February 25, 2005,[70] which indicates that Veronica had "V.R." on her right arm.[71] Thus, Veronica's medical records indicate that Veronica carved her initials in her right arm on either February 24, 2005 or on some day prior to that date.[72] Prior to that admission, Dr. Hector Samaniego—the doctor who prescribes Veronica's psychiatric medications—made an entry in Veronica's medication records that Veronica "has had some self-mutilating behavior evident."[73] Other than this note, no evidence exists of a second incident. Nothing in the record indicates whether the initials observed at the Nix Speciality Hospital was the "self-mutilating behavior" observed by Dr. Samaniego.

Veronica's representative—Jim Sheperd—cross-examined Dr. Cohen about the carving incident. The following colloquy is relevant to Mancera's argument on appeal:

Mr. Sheperd: The self-injurious acts, the cutting her arms, the carving, would that be under personal function or would that be under -

Dr. Cohen: I actually put it under three domains. I included that under social. I included, that's why I gave her a less than marked under caring for herself because that was the single reason that I did not put no limitation and also health and physical well being. I gave her a less than marked because of cutting on herself and running away and putting herself in danger.

Mr. Sheperd: What would be the reason you would not place that in the marked

---

[69]*Id*. at p. 228.

[70]*Id*. at pp. 241-44.

[71]*Id*. at p. 242.

[72]*Id*. at p. 227-44.

[73]*Id*. at p. 307.

>   range, given the fact that she does this on a frequent basis and there also been a problem with run away and these type of self injuries?
>
> Dr. Cohen: Well, I look at the record that part is [sic] the reaction of people in authority over here. [The ALJ] had asked was she in alternative school. I would assume that if the people dealing with her on a daily basis felt that it was that significant that she would have been placed into the alternative campus or that CPS, who is working with her, would have taken her out of her home and placed her in a foster home. And had they done things like that, that would indicate to me that the people who are working with her consider those marked.
>
> Mr. Sheperd: I believe the testimony was that she was placed in a emergency shelter.
>
> Dr. Cohen: But the reasons for that was actually the accusation against the stepfather and it wasn't, the way I understood it, it was to separate her from the stepfather while they were investigating accusations that he had molested her. So it's really a result of the alleged activity of the stepfather as opposed to problems with Veronica.[74]

Because Dr. Cohen suggested that being placed in alternative school might indicate that Veronica was limited in her ability to care for herself, Mancera argues that evidence showing Veronica was placed in alternative school constitutes evidence of a marked limitation in the domain of caring for self.

In the domain of caring for self, the SSA considers how well the child maintains a healthy emotional and physical state, including how well the child gets her physical and emotional wants and needs met in appropriate ways; how the child copes with stress and changes in her environment; and whether the child takes care of her own health, possessions, and living area.[75]

   (i) Caring for [self] effectively, which includes regulating [self], depends upon

---

[74] *Id*. at pp. 337-39.

[75] *See* 20 C.F.R. § 416.926a(k).

> [the child's] ability to respond to changes in [her] emotions and the daily demands of [her] environment to help [herself] and cooperate with others in taking care of [the child's] personal needs, health and safety. It is characterized by a sense of independence and competence. The effort to become independent and competent should be observable throughout [the child's] childhood.
>
> (ii) Caring for [self] effectively means becoming increasingly independent in making and following [the child's] own decisions. This entails relying on [the child's] own abilities and skills, and displaying consistent judgment about the consequences of caring for [self]. As [the child] mature[s], using and testing [her] own judgment helps [the child] develop confidence in [her] independence and competence. Caring for [self] includes using [the child's] independence and competence to meet [the child's] physical needs, such as feeding, dressing, toileting, and bathing, appropriately for [the child's] age.
>
> (iii) Caring for [self] effectively requires [the child] to have a basic understanding of [her] body, including its normal functioning, and of [her] physical and emotional needs. To meet these needs successfully, [the child] must employ effective coping strategies, appropriate to [the child's] age, to identify and regulate [the child's] feelings, thoughts, urges, and intentions. Such strategies are based on taking responsibility for getting [the child's] needs met in an appropriate and satisfactory manner.
>
> (iv) Caring for [self] means recognizing when [the child is] ill, following recommended treatment, taking medication as prescribed, following safety rules, responding to [the child's] circumstances in safe and appropriate ways, making decisions that do not endanger [herself], and knowing when to ask for help from others.[76]

The evidence showing that Veronica was placed in alternative school, however, does not meet this description.

The school records that Mancera submitted to the Appeals Council cover the time period, April 28, 2005 to October 11, 2005.[77] Those records show that Veronica was sent to alternative school for violating a provision of the school district's student code of conduct by bringing an

---

[76] 20 C.F.R. § 416.926a(k)(1).

[77] SSA record, pp. 9-58.

alcoholic beverage to school.[78] The school district incident report indicates that Veronica stole a bottle of MD 2020 malt liquor from a corner store, took the bottle to school on September 26, 2005, hid the bottle in her book bag, drank some of the malt liquor, and shared the bottle with three other students.[79] Because Veronica participated in the school's special education program, the school prepared a behavior intervention plan, dated October 4, 2005, addressing the incident.[80] According to text of the plan, a behavior intervention plan is required for all students with a disability of emotional disturbance.[81] (The school had previously classified Veronica as a student with emotional disturbance.[82]) The plan was completed by Patricia Gibbons, a licensed specialist in school psychology.[83] As a targeted behavior, Gibbons included, "[s]tudent will not bring, use or distribute illegal substances in the school setting."[84] Gibbons reviewed Veronica's behavioral history, observing that Veronica had a problem of inattentiveness, sadness, inability to express feelings, not following school rules, and not completing class work and homework; received regular counseling through an outside agency; and took prescribed medications.[85] Gibbons also reviewed Veronica's past evaluations, dating back to November 21, 2001, and

---

[78]*Id*. at p. 10.

[79]*Id*. at p. 11.

[80]*Id*. at pp. 25-32.

[81]*Id*. at p. 25.

[82]*Id*. at p. 282 (determining on November 12, 2001, that Veronica met the eligibility requirements for special education as an emotionally disturbed student).

[83]*Id*. at p. 32.

[84]*Id*. at p. 25.

[85]*Id*. at p. 30.

summarized recent reports from teachers and Mancera about Veronica's conduct.[86] She then assessed how the violation of the student code of conduct—bringing the alcoholic beverage on campus—related to Veronica's disability of emotional disturbance. Gibbons wrote the following:

> Veronica has a history of depressed mood, physical aggressiveness . . ., implusivity, & reduced capacity for effective coping and stressed interpersonal relationships and not following school/class rules. The incident followed a prior disagreement with other students. However the actual incident was planned and occurred several periods later. It was not an impulsive act nor did it have a direct and substantial connection to Veronica's disability. The relationships with those she shared with were not stressed. She has shown she can be appropriate and follow the rules in some classes.[87]

Gibbons concluded that incident was not a manifestation of Veronica's disability. Gibbons wrote, "The bringing of the alcohol to school, giving alcohol to other students and drinking the alcohol on campus was an arranged series of events completed in a manner that was thought to be not detectable by school staff."[88] After conducting a hearing about the incident on October 11, 2005,[89] the school district assigned Veronica to alternative school for 60 days.[90]

Mancera argues that placement in alternative school indicates that Veronica has a marked limitation in caring for self, but Gibbons's assessment does not indicate that the alcohol incident was related to her impairments or the result of any limitation in Veronica's ability to care for self.

---

[86]*Id.*

[87]*Id.* at p. 31.

[88]*Id.* at p. 32.

[89]*Id.* at pp. 9-10.

[90]*Id.* at p. 10.

Nothing in the school records submitted to the Appeals Council reflects on Veronica's ability to take care of her personal needs, health or safety.[91] Nothing reflects on Veronica's independence and competence to meet her physical needs, such as feeding, dressing, toileting, and bathing, appropriately for her age.[92] Nothing reflects on Veronica's basic understanding of her body, including its normal functioning, and of physical and emotional needs.[93] Nothing reflects on Veronica's ability to recognize when she is ill, follow recommended treatment, take medication as prescribed, follow safety rules, respond to her circumstances in safe and appropriate ways, make decisions that do not endanger herself, or know when to ask for help from others.[94] Although Dr. Cohen used placement in alternative school as an example of an indicator of a marked limitation in caring for self, Dr. Cohen used the example in explaining his consideration of evidence that Veronica had carved her initials in her arm and Mancera's complaints that Veronica had run away from home. Dr. Cohen did not suggest that being placed in alternative school as a disciplinary action for conduct that was not related to Veronica's impairment would change his analysis. The evidence submitted to the Appeals Council does not support a marked limitation in the domain of caring for self because the evidence does not show that Veronica's impairments interfere seriously with her ability to independently initiate, sustain, or complete activities.[95] Consequently, the ALJ did not err by not remanding the case to the ALJ for further

---

[91] *See* 20 C.F.R. § 416.926a(k)(1)(i).

[92] *See* 20 C.F.R. § 416.926a(k)(1)(ii).

[93] *See* 20 C.F.R. § 416.926a(k)(1)(iii).

[94] *See* 20 C.F.R. § 416.926a(k)(1)(iv).

[95] *See* 20 C.F.R. § 416.926a(e)(ii)(2).

consideration.

Without a second marked limitation, the ALJ correctly concluded that Veronica is not disabled. Dr. Cohen testified that Veronica has a marked limitation in only one of the six domains of functioning. Dr. Marler did not find a marked limitation in any domain. Because marked limitations are required in at least two domains of functioning in order for a child's impairments to functionally equal a listed impairment,[96] substantial evidence supports the ALJ's decision that Veronica is not disabled.

## VI.  Recommendation

Even considering the new evidence presented to the Appeals Council, substantial evidence supports the ALJ's determination that Veronica's impairments do not functionally equal a listed impairment in Appendix 1. Consequently, I find the ALJ correctly concluded that Veronica is not disabled. Substantial evidence supports that decision. As a result, I recommend that Mancera's request for relief be **DENIED** and that the Commissioner's decision be **AFFIRMED**.

## VII. Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this Memorandum and Recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "Filing User" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested. Written objections to this Memorandum and Recommendation must be filed within 10 days after being served with a copy of same, unless

---

[96] *See* 20 C.F.R. § 416.926a(a).

this time period is modified by the District Court.[97]  **Such party shall file the objections with the Clerk of the Court, and serve the objections on all other parties and the Magistrate Judge.**  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the District Court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the District Court.[98]  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this Memorandum and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.[99]

    **SIGNED** on February 5, 2007.

                             */s/ Nancy Stein Nowak*
                             NANCY STEIN NOWAK
                             UNITED STATES MAGISTRATE JUDGE

---

[97] 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b).

[98] *Thomas v. Arn*, 474 U.S. 140, 149-152 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).

[99] *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).